Filed 8/21/20  In re J.Q. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re J.Q., a Person Coming Under the Juvenile Court Law. | B305430 (Los Angeles County Super. Ct. No. 20CCJP00228) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. M.H., Defendant and Appellant. | |

APPEAL from the dispositional order of the Superior Court of Los Angeles County, Rashida A. Adams, Judge.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Acting Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

_____

Father M.H. appeals from the juvenile court's dispositional order. When the dependency proceedings began, father had a limited relationship with his 14-year-old, suicidal, daughter J.Q., visiting her on occasion. J.Q. never lived with father; he did not seek immediate custody of her; and he admitted that he lacked the ability to provide her with stable housing. At the dispositional hearing, the Los Angeles County Department of Children and Family Services (DCFS) recommended allowing J.Q. to remain in her mother's custody, but arranging for her to live with her maternal grandparents. Father consented to this arrangement after confirming that the juvenile court was not making any finding of detriment.

At the dispositional hearing, the juvenile court ordered DCFS to provide father with services, including individual counseling and conjoint therapy to facilitate more frequent visits by father. The court identified the services as "enhancement services," and father did not request any additional services. To the contrary, father objected to attending individual counseling.

On appeal, father takes the opposite position, arguing that the court had removed J.Q. from mother's custody because it allowed her to live with maternal grandparents. Accordingly, he was entitled to reunification services. Father requests that this court reverse the dispositional order and remand the case to the juvenile court to order reunification services for him. Father's arguments are forfeited and father has not demonstrated error in

2

the juvenile court's dispositional order.  Even if arguendo the juvenile court erred in not ordering reunification services, father identifies no specific reunification service that the juvenile court should have ordered.  We affirm the juvenile court's dispositional order.

## BACKGROUND

Dependency proceedings commenced in January 2020.  At that time, J.Q. was 14 years old.  A month prior to the commencement of the dependency proceedings, another court had awarded mother sole legal and physical custody of J.Q.  Father did not appear at the hearing in which the family law court determined custody.

### 1.  *Petition*

Mother pleaded no contest to the allegation that she failed to provide J.Q. with appropriate parental care and supervision "due to the child's unique needs."  Mother also pleaded no contest to the allegation that J.Q. was at risk of physical harm.

### 2.  *J.Q.*

J.Q. suffered from a history of depression, and at times was suicidal.  J.Q. drank a bottle of hydrogen peroxide before being admitted into a hospital.  J.Q. explained that she drank the hydrogen peroxide in order to end her life.  DCFS reported that J.Q. "attempt[ed] to end her life on multiple occasions."  A social worker observed numerous burns on J.Q.'s arm, and J.Q. said that she felt better when she burnt her arm.  J.Q. also suffered from an eating disorder.

J.Q. wanted to live with her maternal grandparents.  When she was released from the hospital, she "ran away" from mother

to her maternal grandparents' home. J.Q. told mother, "Let me live there [with maternal grandparents] or I'm going to hurt myself." J.Q. told a social worker, "I need to be away from my mother. We argue too much. We need time apart." Initially mother wanted J.Q. to live with mother, but mother ultimately concluded it was in J.Q.'s best interest to permit her to live with her maternal grandparents. Mother reported that even though J.Q. lived with her grandparents, mother ensured J.Q. attended therapy. Mother reported that she was "still very involved" in J.Q.'s life.

J.Q. did not like mother's boyfriend. J.Q. indicated mother's boyfriend pulled her out of the closet when J.Q. was looking for her sleeping pills. Mother described the same incident as her boyfriend trying to stop J.Q. from taking pills because he and mother feared J.Q. was trying to commit suicide. J.Q. also stated that she may want to live with mother if mother stopped living with her boyfriend.

### 3. *Father*

Mother reported that father did not want to care for J.Q. Mother reported that father had little involvement in J.Q.'s life until January 2020 when he "began telling the child that she didn't need counseling and that the mother was the one that was crazy." Maternal grandmother confirmed that father "has never been very interested in being a part of the child's life" and grandmother believed that "he is not a stable person."

J.Q. wanted to improve her relationship with father. J.Q. did not know father's form of discipline because she had "not spent enough time with my father for him to ever discipline me." J.Q. stated that she knew "that my father does not have a stable home at this time. I talk to him on the phone. My father has told

4

me that he is working on finding a stable home soon." J.Q. indicated she may want to live with father if he had stable housing.

When a social worker attempted to visit father, father's parents responded that father did not live there and did not have a phone. When the social worker spoke to father, he refused to provide an address. The phone number he provided did not permit the social worker to leave a message for him.

Father reported that mother prevented him from seeing J.Q. Father believed that mother emotionally abused J.Q. Father believed that maternal grandmother was a good parent to J.Q. Father indicated that "[i]n one year" he wanted J.Q. to live with him. He was "interested" in having J.Q. reside with him.

Paternal grandfather, who met J.Q. for the first time when she was 6 years old, indicated that father "would be a good father" to J.Q. Paternal grandfather was "shocked" when he met J.Q. "because my son never told us that he had a daughter." Grandfather reported that father had not seen J.Q. "more than 8 or 10 times."

Father did not schedule any visits with J.Q. between January and March 2020.

### 4.    *Additional information in DCFS reports*

In the jurisdictional report, DCFS concluded that "it is believed that the children could safely remain in the mother's care. Mother has made an arrangement with the maternal grandmother to allow J[.Q.] to reside with maternal grandparents. Also there have been no new reports of abuse or neglect. Therefore, the Department believes that the previous order for the children to be released to the Home of Mother is appropriate and for it to remain in full force and effect." DCFS

recommended that the juvenile court provide father reunification services.

## 5.    *Jurisdictional and dispositional hearing*

Father appeared at the combined jurisdictional and dispositional hearing and was represented by counsel.  Mother pleaded no contest, and the court sustained the petition.

DCFS recommended that J.Q. remain in mother's home "with a plan of the minor residing with the maternal grandparent . . . ."  DCFS recommended enhancement services for father and recommended the court "make a detriment finding [if the court were to] plac[e] the minor [J.Q.] with the father . . . ."

Father's counsel asked the court whether DCFS requested "the minor [be] detained from father."  The court indicated that because DCFS was not recommending removing J.Q. from mother, Welfare and Institutions Code section 361.2, governing the placement of a child with a noncustodial parent, was not triggered.[1]  The juvenile court further explained that because

---

[1] All statutory citations are to the Welfare and Institutions Code.

Section 361.2 provides in pertinent part:  "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child.  If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child.  The fact that the parent is enrolled in a certified substance abuse treatment facility that allows a dependent child to reside with their parent shall not be, for that

6

section 361.2 was not triggered, the court was not required to make a detriment finding, i.e., whether it would be detrimental to place J.Q. in father's custody.

Father's counsel responded: "And on that basis, we would submit and just point out that prior to the intervention, there was visitation that occurred between father and minor [J.Q.] and that that used to take place with father picking up the child from the maternal grandmother's home. [¶] My client states that since detention, he hasn't really been able to utilize that plan because mother has—mother has conveyed to the maternal grandmother that the visitation needs to go through her and not through the maternal grandmother. But that is not the arrangement that was used previously. So perhaps we could just get clarification today." Father's counsel agreed to the juvenile court's suggestion that DCFS should assist father with a visitation schedule.

Father's counsel objected to a court order requiring father attend individual counseling. "We would be objecting to any order of individual counseling. . . . I don't believe that my client is in need of having to go to individual counseling himself."

6.    *Juvenile court orders*

The court declared J.Q. a dependent of the juvenile court. The court concluded that J.Q.'s health and safety "can be protected without removing her from the mother's physical custody. Prior to the Department's intervention, the child was and has been in the physical custody of the mother. That will remain, as the court is not removing." "The court orders the child

reason alone, prima facie evidence that placement with that parent would be detrimental." (Section 361.2, subd. (a).)

released to the home of the mother with the plan that she will reside with the maternal grandparents . . . ."

The court ordered DCFS to provide mother with family maintenance services and father with family enhancement services. The court ordered father to attend individual counseling and conjoint counseling with J.Q. "The recommendation is for individual counseling to address case issues, including the child's mental health diagnoses and needs. It is apparent from the evidence before the court that there has been . . . numerous mental health issues that . . . father has not been integrally involved in helping the child to address . . . ." The court ordered DCFS to provide father with a written visitation schedule after conferring with mother and J.Q. At the conclusion of the dispositional hearing, the court then set a review hearing pursuant to section 364.

## DISCUSSION

Father argues "that since J.Q. was effectively detained from mother's custody, the court should have scheduled a review hearing pursuant to section 366.21, subdivision (e) rather than a status review hearing pursuant to section 364, and should have ordered 'reunification service' for him rather than 'enhancement services.' " Father's arguments lack merit.

### A.    Status Review Hearing

Father does not demonstrate that his argument concerning which statute governs the status review hearing is cognizable in this appeal. Father has not appealed from the order following the status review hearing. Instead, he is challenging the juvenile court's dispositional order.

8

On the merits, the trial court did not err in setting a status review hearing under section 364. After assuming jurisdiction, a juvenile court must hold a hearing within six months to review the case. The statute that governs the review hearing depends on whether the juvenile court removed the child from the custodial home. When the juvenile court removes a child from the custodial home, it applies section 361.2;[2] when the court does not, it applies section 364.[3] Here, the juvenile court did not

---

[2] Section 366.21, subdivision (e)(6) provides: "If the child had been placed under court supervision with a previously noncustodial parent pursuant to Section 361.2, the court shall determine whether supervision is still necessary. The court may terminate supervision and transfer permanent custody to that parent, as provided for by paragraph (1) of subdivision (b) of Section 361.2." Section 361.2, subdivision (b)(1) provides: the juvenile court may "[o]rder that the parent become legal and physical custodian of the child. The court may also provide reasonable visitation by the noncustodial parent. The court shall then terminate its jurisdiction over the child. The custody order shall continue unless modified by a subsequent order of the superior court. The order of the juvenile court shall be filed in any domestic relation proceeding between the parents."

[3] Section 364 provides in pertinent part: "(a) Every hearing in which an order is made placing a child under the supervision of the juvenile court pursuant to Section 300 and in which the child is not removed from the physical custody of his or her parent or guardian shall be continued to a specific future date not to exceed six months after the date of the original dispositional hearing. . . . " "(c) After hearing any evidence presented by the social worker, the parent, the guardian, or the child, the court shall determine whether continued supervision is necessary. The court shall terminate its jurisdiction unless the social worker or his or her department establishes by a

9

remove J.Q. from mother's custody.  It therefore properly set a review hearing under section 364.

## B. Father Forfeited His Request for Reunification Rather Than Enhancement Services and Fails to Show that In the Context of This Case There Is Any Distinction Between the Two Types of Services

There is no statutory definition of enhancement services. (*In re A.L.* (2010) 188 Cal.App.4th 138, 142, fn. 2.)  Father relies on the following definition:  "child welfare services offered to the parent not retaining custody, designed to enhance the child's relationship with that parent." (*Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1497, fn. 1.)  Enhancement services typically are provided to the noncustodial parent when the child remains in the custody of the other parent.  (*In re A.L., supra*, 188 Cal.App.4th at p. 142, fn. 2.)  Father does not dispute that the juvenile court properly ordered enhancement services *if* J.Q. remained in mother's custody.  In contrast, "[f]amily reunification services shall only be provided when a child has been placed in out-of-home care, or is in the care of a previously noncustodial parent under the supervision of the juvenile court." (§ 16507, subd. (b); see § 361.2, subd. (b)(3) [providing for reunification services to a parent from whom a child is removed if the child is placed with a previously noncustodial parent].)

Instead, father argues that the juvenile court created a "legal fiction" by ordering J.Q. in mother's custody and

---

preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that these conditions are likely to exist if supervision is withdrawn. . . . "

simultaneously ordering J.Q. live with her grandparents. Father argues that because J.Q. was essentially placed in her grandparent's custody, the juvenile court was required to remove J.Q. from mother's custody and order reunification services for him. Father forfeited this argument by failing to raise it in the juvenile court. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.)

Even assuming arguendo that father preserved this argument, it is not well founded. First, father relies on *Savannah B. v. Superior Court* (2000) 81 Cal.App.4th 158, 161–162 (*Savannah B.*) to argue the juvenile court erred in ordering J.Q. to remain in mother's custody and simultaneously letting J.Q. live with her grandparents. *Savannah B.* is inapposite. There the juvenile court found there were no reasonable means to protect the child from severe emotional damage without removing the child from her mother's custody. (*Id* at p. 161.) At the same time, the juvenile court granted mother a 60-day home visit. Calling the 60-day home visit a "legal fiction," our colleagues in Division 4 held there was no authority for removing a child from a parent's custody to protect the child only to return the child immediately to that very parent. (*Id*. at p. 162.)

In contrast, here, the juvenile court did not find that remaining in mother's custody would harm J.Q. To the contrary, the juvenile court found that "release of the child to the mother would *not* be detrimental to her safety, protection, or physical or emotional well-being." (Italics added.) We fail to discern the relevance of *Savanna B.* to this case, and father has cited no other authority to support his claim that the juvenile court erred in allowing mother to retain custody while J.Q. lived with her grandparents.

11

Second, father benefited from the juvenile court's disposition. If the juvenile court had removed J.Q. from mother's custody, the juvenile court would have had to determine whether J.Q. would suffer detriment by being placed in father's custody. (Section 361.2, subd. (a).) Father's counsel asked whether the court would determine whether it was detrimental to place J.Q. in father's custody. When the juvenile court explained that it was not required to make any finding of detriment as to father because J.Q. remained in mother's custody, father's counsel submitted to DCFS's proposed disposition that J.Q. remain in mother's custody and live with her maternal grandparents. Thus, the record supports that father did not object to the dispositional order insofar as it continued J.Q.'s placement in mother's custody.

Finally, father demonstrates no qualitative difference between the services the juvenile court ordered and referred to as "enhancement services" and those he purportedly seeks but fails to identify as reunification services. Stated otherwise, father identifies no specific service the juvenile court should have ordered for him to attend. Indeed, father objected to attending the individual counseling that the juvenile court did order him to attend. Therefore, even assuming the juvenile court erred in awarding him enhancement as opposed to reunification services, father demonstrates no prejudice.

## DISPOSITION

The juvenile court's dispositional order is affirmed.

<u>NOT TO BE PUBLISHED.</u>

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

SINANIAN, J.*

---

\*  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.